**PARAMOUNT PICTURES, Inc., v. UNITED MOTION PICTURE THEATRE OWNERS OF EASTERN PENNSYLVANIA, SOUTHERN NEW JERSEY AND DELAWARE, Inc., et al.**

No. 6565.

Circuit Court of Appeals, Third Circuit.

Dec. 13, 1937.

William A. Schnader, of Philadelphia, Pa., Morgan S. Kaufman, of Scranton, Pa., and Austin C. Keough, of New York City (William A. Schnader, of Philadelphia, Pa., and Louis Phillips and Irving Cohen, both of New York City, of counsel), for appellant.

Otto Kraus, Jr., and Benjamin M. Golder, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BUFFINGTON, Circuit Judge.

This is an appeal from a decree of the District Court dismissing the appellant's bill of complaint for lack of jurisdiction.

The appellant, a manufacturer and distributor of motion picture films, is a corporation of New York. The appellees are corporations and individuals who own and operate moving picture houses in Eastern Pennsylvania, Southern New Jersey and Delaware. The appellant filed a bill of complaint against the appellees for an injunction charging them with having formed an illegal combination and conspiracy in restraint of trade or commerce among the several states in violation of section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, which provides that:

Section 1 of the Sherman Act: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Section 16 of the Clayton Act, 15 U.S.C.A. § 26, provides that: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the anti-trust laws."

Admittedly, what the appellees set out originally to do was a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq. As appears by the untraversed bill and by affidavits, they combined and conspired: (1) To prevent by coercive means the making of contracts for future distribution of the films produced by the appellant in interstate commerce until it offered better prices and terms; (2) to prevent the exhibiting of the producer's films and their transportation in interstate commerce to fulfill existing contracts until the appellant complied with the demands of the conspirators.

In order to carry out their purpose, the appellees planned to boycott all Paramount pictures as long as might be necessary to compel it to offer better terms for its license agreements for 1937-1938.

On June 25, 1937, one of the appellees, United Motion Picture Theatre Owners of Eastern Pennsylvania, Southern New Jersey and Delaware, Inc., hereinafter called "United," called a meeting at Philadelphia at which it voted to boycott the Paramount Company or to bring about a so-called "strike" against the use of its films. A "War Board" was appointed and a "War Chest" authorized. Eastern Pennsylvania, Southern New Jersey, and Delaware were divided into zones and a zone captain was appointed in each zone whose duty it was to ascertain who in his zone was violating the boycott and report the same to the "strike" headquarters.

The boycott in the territory of the three states mentioned was part of a proposed nation-wide boycott against the Paramount Company. A meeting was held on June 29, 1937, at Washington, D. C., which three individual defendants representing "United" attended. Representatives of exhibitor associations from many parts of the United States were at the meeting.. The chairman read a speech charging the Paramount Company with "unfair, indecent and unethical business practices."

He then discussed the question of punishment and said: "There is only one way in which Paramount can be punished—viz. through its pocketbook. * * *" "If the owners of four thousand theatres, who bought 1936-37 Paramount program, should decide not to buy 1937-38 program * * * it would cause Paramount a loss in revenue of between eight and ten million dollars. Thus, a 'sit-down strike' by four thousand theatres with respect to the 1937-38 Paramount program would deprive that company of its anticipated profits for the current year. ' * * *" "But the real value of such concerted action on the part of the number of exhibitors would be the effect it would have upon the other major distributors."

He then asked: "Have you, the owners of four thousand theatres, the courage—the guts—to take the action—a 'sit-down strike' against Paramount * * * ?"

The meeting then "was of the unanimous opinion that this campaign against Paramount shall be declared a 'Buyers' Strike', or a 'Sit-Down Strike' of exhibitors against Paramount." Thereupon the exhibitors throughout the country were called upon to carry out the plan "as adopted by the present Conference."

The plan in part consisted of the refusal of all exhibitors throughout the United States to show Paramount pictures or to enter into 1937–38 contracts with Paramount during the period of the "strike" unless Paramount's terms were modified.

Mr. J. P. Wood of Columbus, Ohio, was then elected "as the clearing agency of this National Campaign, to whom all exhibitor organizations are to send full data as to the steps they adopt and the procedure which they take during the progress of this 'Strike'."

On July 2, 1937, George P. Aarons, one of the defendants, and secretary of "United," who is a lawyer and who it appears was an active agent, sent out a letter to every exhibitor, sales manager, and officer of producing companies and to the trade papers in Eastern Pennsylvania, New Jersey, and Delaware, in which, after denouncing Paramount and calling a mass meeting of exhibitors at the Broadwood Hotel on July 8, 1937, among other things, said: "Your organization has declared a strike against Paramount's 37-38 terms and urges you to delay buying or negotiating until we have obtained a revision of these terms * * *

Your organization .has voted to lawfully picket any theatre in the zone that buys Paramount pictures, features, shorts and newsreels, on and after August 1st * * * This strike is a part of the national strike! Don't fail us!" This letter and much other material, if not all, that "United" put out, were sent to other exhibitor organizations "all over the United States" and "also to Canada."

During July, 1937, Aarons continued to send out pamphlets, post cards, and letters not only to exhibitors and exhibitor organizations in New Jersey, Pennsylvania, and Delaware—who were the plaintiff's only possible buyers of its product—but all over the entire United States and "to certain public officials, members of Congress, members of legislatures, to members of the judiciary," persuading exhibitors not to deal with the Paramount Company and threatening them if they did so. Such statements as the following were sent out:

"Any exhibitor who signs a contract in violation of the buying strike should be picketed, as well as any one who, without proper dispensation of the War Board, does not join in the August date strike."

"The U M P T O (United Motion Picture Theatre Owners) organization says be a man not a mouse. Fight this along the lines of campaign adopted by the elected War Board. Stick to your guns! Hold yourself in readiness for the date strike, the mass protest (if you want to stay in business) when advised by your organization."

"All Exhibitors Violating the Strike Will be Picketed."

"Attendance at This Meeting (August 2, 1937) is Compulsory."

"On August 2nd, the elaborate picketing campaign goes into effect.

"This will include:

"1. Picketing from the Sky for the first time in the history of aviation.

"2. Cruising. Trucks both in Philadelphia and throughout the territory.

"3. Circularizing All Towns where exhibitors refuse to cooperate.

"4. Trailers on 300 Screens.

"5. Ads in the Newspapers.

"6. Contacting of local labor unions.

"7. Pickets in Front of Theatres.

"8. Radio Broadcasts.

"A list of men who fail to cooperate in Paramount strike will be posted outside

Strike Headquarters—301 N. 13th Street. You Must Not permit these misguided exhibitors, few in number, to threaten success of this protest against Paramount's insolent demands for gratis interest in your theatre, and their stubborn refusal to deliver pictures sold you * * * We Cannot Tolerate Strike Breakers."

"The Independent exhibitors are on strike against theatres playing Paramount pictures because these theatres are Unfair to organized independent theatres. Ask Driver for free literature."

Post cards were sent out on the sides of which was the picture of a truck to be used in picketing. Across one end of the card in front of the truck was the following: "U.M.P.T.O.E. Pa., S.N.J. and Del. 301 N. 13th St., Phila. Pa.

"This is the truck which will picket each theatre violating August Date Strike.

"Play no Paramount Pictures, Features, Shorts, News Reels Until Strike is Settled! Geo. P. Aarons, Secretary."

On the side of the truck was a large poster or billboard containing, among other things, an inscription reading in part as follows:

"An appeal to the public conscience. Support our Strike against Paramount Pictures," etc.

It is also to be noted as the then present object of the combination, the purpose to stop the interstate commerce of the plaintiff, that the Washington conference's unanimous declaration was: "That all exhibitors throughout the United States refuse to play any Paramount pictures during the month of August, 1937, and for such longer period as the Conference may, by its future action, decide upon."

It is also noted that in this same report, under the head "the Punishment," this sinister statement is made: "Dorothy Thompson in one of her recent articles attributes the following statement to Leon Trotsky— 'We need only a handful of men who are sufficiently disciplined, and sufficiently *ruthless to accomplish* our purpose'. [Italics ours.] It might be well if the same technique were adopted by the four thousand theatres and applied to Paramount."

Any sound interpretation of this evidence, if carried out, admittedly brings the action proposed by it within the inhibition of the Sherman Act, but since the present counsel, employed after the bill was filed, became connected with the case and guided

the conduct of the appellees, defendants have changed their attitude and modified the methods by which they now propose to bring about the object of the combination of which they are a part. Mr. Aarons, secretary of "United," in cross-examination, said that: "* * * on advice of counsel, the organization and the so-called War Board and the officers and members of the organization have no intention whatsoever to station pickets in front of theatres who play Paramount pictures during August, or of the theatres of any exhibitor who enters into a contract with Paramount for so-called '37-'38 product, but it is the intention of the organization to use this so-called truck to which reference has been made, but not to stop in front of theatres and remain, but to carry the message that the exhibitors feel that they have been unjustly dealt with by Paramount, and carry that message in a lawful manner direct to the public."

He further said that it was the intention of the appellees "* * * to use the truck generally in cruising throughout the city with the message on the side of the truck that is indicated, and it is not the intention, nor has it ever been the intention of the organization, or any members with whom I have spoken, to threaten, intimidate or coerce by any means whatsoever any exhibitor who plays Paramount pictures or who would enter into a contract with Paramount for the '37-'38 contract."

He further said: "We plan to use lawful means of persuasion and inducement and to carry our message to other exhibitors and to the public as to the situation of the unfairness of Paramount which we believe to be unfair, * * * and also to the terms that have been indicated under which the exhibitor can and can only enter into for the '37-'38 product."

The change in the position of the appellees was stated by the learned trial judge in his opinion in the following language:

"Whatever was at first intended to be done, all purpose is now disclaimed to do more than themselves to refrain from all dealings with the plaintiff and by a recital of their believed grievances against the plaintiff, to persuade all other exhibitors to likewise refrain."

"This leads to another anticipation of the discussion, by raising the question of whether refusing to have business dealings with the plaintiff is any trespass upon the legal rights or becomes such by being expanded into a conspiracy to induce or force

others to refuse to have such dealings, and the further question of the venue jurisdiction of a court of the United States to determine such a controversy. The experienced counsel for the plaintiff asserts that an affirmative answer to these questions is supplied by the Sherman Anti-Trust Act and the supplements thereto. There is thus raised the sharply defined question presented in this cause."

In other words, it is the contention of the appellees that, without violating the law, they may now by "peaceful persuasion" effect the object of the combination and conspiracy originally formed and now existing.

■ Before discussing the legal questions involved arising from these adverse contentions, we commend present counsel for bringing about a change in the attitude of the appellees. There is no question that before that ' time they intended to picket theatres, station trucks in front of them, and to employ all their stated coercive measures necessary to prevent them from using Paramount films in their theatres, notwithstanding what they may now say. A fair and logical interpretation of the evidence forces this conclusion. But the fact remains that, in spite of the frank and commendable assurance given by counsel to the court, coercion effective to produce the result intended may result from other than physical force and what they originally intended to do by violent means, and what they now propose doing by "persuasion" could not be done without the interference and stoppage of the free flow of interstate commerce. The original and comprehensive plan of which they were a part was intended to bring about a boycott of Paramount by all the exhibitors throughout the United States which would result in a loss to Paramount "of between eight and ten million dollars," and that aim and purpose they now still seek to effect. This could be accomplished only by stopping the movement in interstate commerce of the products of Paramount, and this the appellees well knew and now intend. This has already been the immediate result of what they did, and this has had, and must have in the future, a direct effect upon the free flow of interstate commerce. The only way that Paramount has to dispose of its products to the trade throughout the United States is by interstate transportation. In this way the combination, composed of the appellees and others, thought that Paramount would make a profit of eight to ten million dollars during the current year of 1937-38. The direct and real object of the appellees was to secure by different and better terms their contracts with Paramount, but this they could not do except by stopping the flow of Paramount's products in interstate commerce.

There is no doubt that the appellees and their associates constituted a combination or conspiracy and that the accomplishment of their aim must be done by a method which restrains and dams back trade or commerce among the several states. Such a combination is declared by section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, to be illegal, and, under the provisions of section 16 of the Clayton Act, 15 U.S.C.A. § 26, any person or corporation aggrieved by its action may sue in any court of the United States having jurisdiction over the parties for the injunctive relief prayed for in the plaintiff's bill, which also seeks "such other, further and general relief as the nature of the case may require and the Court may deem proper."

The methods which the defendants proposed and used to effectuate their objects constitute a secondary boycott, for they are coercive and enlist the co-operation of others than themselves. While Mr. Aarons, one of the defendants and secretary of United, now disclaims any intention "to threaten, intimidate or coerce," or "to station pickets in front of theatres," yet he still says that it is their intention to use trucks to cruise throughout the territory, Southern New Jersey, Eastern Pennsylvania, and Delaware, on the sides of which are to be such statements:

"An appeal to the public conscience. Support our Strike against Paramount Pictures. Paramount's demands for higher film prices means:

"1. Closing of hundreds of theatres.

"2. Loss of jobs for countless ushers, cashiers, doormen—others.

"Do not patronize any Theatre playing Paramount Pictures," and other such prejudicial and inflammatory statements.

While the defendants now deny any intention of picketing in front of theatres or of stationing their trucks there, such intention has not been disclosed to the defendants generally, and there has been no denial that they intend to picket from the sky, to circularize all towns, to have "trailers on 300 screens, to have ads in newspapers, to contact and enlist the help of local labor unions, to engage in radio broadcasts."

While the defendants may call this "peaceful persuasion," as the Supreme Court said in the case of the Eastern States Lumber Association v. United States, 234 U.S. 600, 608, 34 S.Ct. 951, 953, 58 L.Ed. 1490, L.R.A.1915A, 788, "he is blind indeed who does not see the purpose in the predetermined and periodical circulation of this report to put the ban upon wholesale dealers" who sold direct to the consumers and thus eliminated the retailer.

The same court in commenting upon this case in the case of Duplex Co. v. Deering, 254 U.S. 443, 464, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, said that by the circulation of this list of wholesalers among the retailers the "wholesale dealers were subjected to coercion merely through the circulation among retailers, who were members of the association."

Of course, an individual may restrain interstate commerce without coming within the inhibition of the statute. The anti-trust act may forbid the commission of a certain action by a combination or conspiracy, but may not interfere with the same action when done solely by an individual. Congress intended by the anti-trust acts to prevent all combinations and conspiracies, whether composed of employees, employers, producers, users, or consumers, from unreasonably restraining the free flow of interstate commerce.

It is true that a single individual may be and often is powerless in dealing with an employer or producer, but if the law prevents employers, firms, and corporations from combining or conspiring in restraint of trade or commerce among the several states, individuals, without having to meet artificial conditions created by combinations, may effectively deal with individual employers or producers on the merits of any transaction. It has often been said that "competition is the life of trade." Congress in passing the anti-trust acts intended to free interstate commerce from the evils produced by combinations and conspiracies of all kinds. The question for the courts, however, is not economic, but wholly legal, to wit, the true interpretation of the law as enacted by Congress.

An effort was made at the trial to make it appear that the action taken at the meetings was individual and not joint or combined. This argument is based upon the fact that at the meetings each of the appellees when called upon "individually stated that they were not going to negotiate nor buy any Paramount pictures and play any feature, shorts or news during August," and this conclusion each appellee indicated "either by making a short speech or by raising his hand or nodding his head, or some motion of that kind." But the action taken in this case was that of the combination. All the conspirators were in accord. The secretary of "United" constantly sent out literature to every exhibitor in Eastern Pennsylvania, Southern New Jersey, and Delaware and elsewhere containing such statements as the following: "Your organization has voted to lawfully picket any theatre in the zone that buys Paramount at this time or plays any Paramount pictures, features, shorts or news reels, on and after August 1st * * * This Strike is a Part of the National Strike! Don't Fail Us." The evidence, when fairly construed, makes it plain that the appellees had formed a combination or conspiracy and were acting together as a unit and are still so acting.

The Supreme Court, in construing the anti-trust act, made it clear, we think, that combinations or conspiracies constituting a secondary boycott, as we have here, in restraint of trade among the states, are illegal and may be enjoined even though the restraint is produced by means of peaceful persuasion. In Eastern States Lumber Ass'n v. United States, supra, there was no open threat or express intimidation. Certain wholesale lumber dealers sold lumber directly to consumers and thereby eliminated retail dealers in the immediate territory where such sales were made. Thereupon certain retail dealers in New York, New Jersey, Pennsylvania, Connecticut, Massachusetts, Rhode Island, Maryland, and the District of Columbia got together and sent the following report to the retail dealers:

"You are reminded that it is because you are members of our Association and have an interest in common with your fellow members in the information contained in this statement, that they communicate it to you; and that they communicate to you in strictest confidence, and with the understanding that you are to receive it and treat it in the same way.

"The following are reported as having solicited, quoted, or as having sold direct to the consumers:

"(Here follows a list of the names and addresses of the various wholesale dealers).

"Members upon learning of any instance of persons soliciting, quoting, or selling di-

rect to consumers, should at once report same, and in so doing should, if possible, supply the following information:

"The number and initials of car.

"The name of consumer to whom the car is consigned.

"The initials or name of shipper.

"The date of arrival of car.

"The place of delivery.

"The point of origin."

Here there was no threat, not even voiced persuasion, but only the circulation among members of the association of confidential information. The intention, of course, was to have the retailers in the future refrain from dealing with the listed wholesalers. As stated by the syllabus, the law which that declares is that, "while a retail dealer may unquestionably stop dealing with a wholesaler for any reason sufficient to himself, he and other dealers may not combine and agree that none of them will deal with such wholesaler without, in case interstate commerce is involved, violating the Sherman Law."

So also the Supreme Court in the case of Lawlor v. Loewe, 235 U.S. 522, 534, 35 S.Ct. 170, 172, 59 L.Ed. 341, commenting on the case of Eastern States Retail Lumber Dealers' Association v. United States, said: "That case establishes that, irrespective of compulsion or even agreement to observe its intimation, the circulation of a list of 'unfair dealers,' manifestly intended to put the ban upon those whose names appear therein, among an important body of possible customers, combined with a view to joint action and in anticipation of such reports, is within the prohibitions of the Sherman act if it is intended to restrain and restrains commerce among the states."

The circulation of a list may be styled "peaceful persuasion," but it is usually a potent and effective, coercive agent to effectuate a boycott. The sending out of various statements by the defendants in the case at bar was just as much a coercion as was the circulation of the list of wholesalers in the Eastern States Retail Lumber Dealers' Case. Irrespective of compulsion or physical violence, the circulation of a list of "unfair dealers" or the dissemination of any other prejudicial or coercive information by a combination which unreasonably obstructs the free flow of interstate commerce is forbidden by the Sherman Act.

In the case of Duplex Co. v. Deering, 254 U.S. 443, 467, 468, 41 S.Ct. 172, 177, 65 L.Ed. 349, 16 A.L.R. 196, the Supreme Court said: "It is settled by these decisions [Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490, L.R.A.1915A, 788; Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341] that such a restraint produced by *peaceable persuasion* is as much within the prohibition [of the Sherman Act] as one accomplished by force or threats of force; and is not to be justified by the fact that the participants in the combination or conspiracy may have some object beneficial to themselves or their associates which possibly they might have been at liberty to pursue in the absence of the statute."

In Arkansas Wholesale Grocers' Association v. Federal Trade Commission, 18 F. 2d 866, 872, Judge Van Valkenburgh, speaking for the Circuit Court of Appeals for the Eighth Circuit, said: "It is next insisted that the facts in evidence do not sustain the finding; that petitioners resorted merely to persuasion and that this they had a right to do provided that persuasion was peaceful and unattended by coercion or intimidation. The controlling decisions are to the contrary as applied to the facts in this case. Eastern States Lumber Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490, L.R.A.1915A, 788; Lawlor v. Loewe, 235 U.S. 522, 534, 35 S.Ct. 170, 59 L.Ed. 341."

The evidence in the case at bar conclusively shows that the defendants violated the Sherman Anti-Trust Act by disseminating prejudicial, threatening, and coercive literature and by appealing to the public for help in their fight. The plaintiff is entitled to injunctive relief.

So holding, the decree of the court below is reversed and the record remanded, with directions to reinstate the bill and to proceed in due course in accordance with this opinion.