**MID–WEST THEATRES CO. v. CO–OPERATIVE THEATRES OF MICHIGAN,**
**Inc., et al.**
**Civil Action No. 1350.**

District Court, E. D. Michigan, S. D.
Sept. 10, 1941.

Ralph E. Routier and Shapero & Shapero, all of Detroit, Mich., for plaintiff.

Butzel, Levin & Winston and Adrian D. Rosen, all of Detroit, Mich., for defendants.

PICARD, District Judge.

In order to fully understand the issues involved in this matter, the court deems it necessary to review some complexities involved in the journey of the motion picture film from producer-to distributor-to exhibitor-to the public, and back on its return trip. It is also necessary to consider contractual practices which have developed in the trade as the subject of economic bargaining between the exhibitor and producer or distributor.

In the United States there are eight major producing companies and two minors. The majors produce between three hundred and seventy-five and four hundred

full length films a year; about fifty or sixty westerns. One of the minors produces about thirty features considered. as of major quality; and perhaps an equal number of westerns. This totals between four hundred and fifty and five hundred motion pictures a year. These pictures when completed are sent to distributors in the various states to be shown in "first run" houses. In Detroit these "first run" houses number five all being operated by distributors or their affiliations. None is a member of defendant Co-Operative. When a picture comes to a first run house no other theater in Detroit, or within an area of sixty-five miles, may run that same picture, and if it plays a week at the first run house it may not be exhibited within that area until twenty-eight days after the end of that week. If it plays more than a week it may not be exhibited for forty-two days after it has closed at the first run house. This usually is referred to as "protection", or "clearance", or both.

The picture then goes to second run houses of which there are eight in Detroit —two among the defendants in this case, with particular reference to the Hollywood one of the theaters owned by co-defendants Cohens. After the film is exhibited at second run houses, it goes to "key run" theatres, but may not be exhibited there until seven days following its close at second run houses. These runs, insisted upon by exhibitors and distributors, are covered by appropriate and customary phraseolgy in contracts negotiated from time to time.

Plaintiff corporation owns one "key run" theater, the Colonial, and a subsequent run theater, the Majestic, both on Woodward Avenue. Defendants here are an association of about one hundred second, key and succeeding run theaters and several of its individual members. The Cohen-owned Hollywood (second run) is not in competition with any of plaintiff's theaters, but Cohens' Roxy and Mayfair compete with plaintiff's Colonial and Majestic respectively. The four playhouses are located in down town Detroit on Woodward Avenue; have practically the same seating capacity in each, and the same appointments. This action is against Co-operative and individual members, plaintiff claiming that the activities of defendants are in violation of the Sherman Anti-Trust Act, particularly Sections 1 and 2, 15 U.S.C.A. §§ 1, 2, and Clayton Act, 15 U.S.C.A. §§ 12, 13, and the Robinson-Patman Act, 15 U.S.C.A. §§ 13a, 13b, 21a.

Plaintiff alleges that defendant members, through Co-Operative with its one hundred or more theaters, representing fifty per cent of the seating capacity of metropolitan Detroit exclusive of first run houses, so controls the moving picture industry in Detroit, particularly as affecting "key" and following run houses (seventy-six percent) that plaintiff cannot secure or even negotiate for any major picture booked by Co-Operative until after it has played the Roxy or Mayfair theaters. This, of course, seriously depreciates revenue obtainable by plaintiff and because of this alleged violation of the anti-trust laws plaintiff has been obliged to put in or continue to run vaudeville with minor features.

Plaintiff also claims that Co-Operative has conspired to and is acting illegally in many ways; that it has caused major producers to cancel contracts with non-member independents; that it has compelled its members to give up practically all individual buying; that Co-Operative is controlled by an inner clique of small chains which dominates its policy; that Co-Operative's manager buys those pictures the directors tell him to buy regardless of the wishes of Co-Operative's lesser individual members thus compelling its small independent members to take what is given them; that since Co-Operative is buying for over one hundred theaters it pays less for pictures than independents must pay; that it has conspired to stifle all competition through use of this tremendous buying power, particularly as to plaintiff, even though plaintiff has been willing to outbid the Cohens for some picture films; that so firm is Co-Operative's strangle hold upon Detroit's motion picture industry that if a major producer did sell plaintiff a feature to be played in advance of the Roxy or Mayfair theaters that producer would be excluded from selling not only the Roxy and Mayfair but would be boycotted by the entire one hundred theaters belonging to Co-Operative; that in this manner plaintiff gets only crumbs from the moving picture theatrical table and that these acts are in violation of the Sherman Anti-Trust Laws assuring free competition.

Plaintiff therefore seeks to prevent Co-Operative from using its combined buying power to benefit its individual members and asks this Court to hold that activities of de-

fendant, Co-Operative, permitting it directly or indirectly to throw the weight of its one hundred theater buying power into the purchase of pictures for its individuals should be declared illegal. Plaintiff insists as a principle that individual members of Co-Operative be obliged to do their own purchasing and asserts that it only seeks "fair competition" in asking for part of the pictures that now go to the Cohens. It admits that a moving picture operator of two theaters is in a better bargaining position than an individual or company owning only one theater and since plaintiff now operates four show houses it recognizes that it is in a much better position to get pictures, both as to clearance and price, than the independent owning only one. It claims that if it were in competition with Cohens' Roxy and Mayfair alone it could outbid the Cohens because distributors would rather sell to four theaters than to one. But plaintiff—and this court deems this fact of great importance—recognizing this bargaining right-of-might unto itself insists that it is wrong for one hundred independents to associate together to, for example, combat the buying power of chains of theaters—some of them very large chains independently owned and others owned or controlled by the producers— or to assist them in collectively bargaining more effectively with producers.

Defendants deny all allegations of wrong doing. Organized under laws of the State of Michigan they maintain they have kept within those laws and insist that plaintiff suffers not because of Co-Operative, but because the Cohens owning one "second run" theater, in addition to the Roxy and Mayfair, have a better buying power than plaintiff. They claim the Cohens without Co-Operative can outbid and out-buy plaintiff and that Co-Operative was organized to defend independents from distributors and producers who were beginning to control the very life blood of the independent exhibitor; that it has made better prices for Detroit theatergoers, secured better pictures and made more competition; that their procedure does not differ economically or legally from any other co-operative or collective activity which exists in other fields of endeavor such as co-operative marketing or co-operative buying by independent grocery groups formed to combat the chains. They deny that they prevent any major from selling plaintiff except on such clearances as is recognized as being necessary in the motion picture business.

They deny all allegations of illegal functioning of Co-Operative, admitting that the directors "supervise" the buying of pictures but insisting that Co-Operative renders many additional valuable acts of service apart from buying pictures.

It is also well to add at this point that plaintiff purchased its string of theaters from its chief stockholder's (Ray Schreiber) uncle, who had previously brought a similar suit against Co-Operative before Judge Edward J. Moinet in this district. Colonial Theatrical Enterprises, Inc., et al., plaintiffs, v. Co-Operative Theatres of Michigan, Inc., et al., defendants,[1] In Equity No. 6476, tried in 1935-36. Judge Moinet held that on the facts before him defendants were not engaged in interstate commerce but the record here is entirely different, and there is some merit to plaintiff's contention that improper practices of the Uncle as an exhibitor entered into the equities involved. Then when plaintiff acquired these theaters it too made application for membership in Co-Operative and was turned down. It is admitted that there is nothing personally or ethically disqualifying in Raymond Schreiber, and it is apparent that plaintiff was not allowed membership in Co-Operative because with the Cohens as members, Co-Operative would have two competing companies each wanting major products in a concentrated and competing area of Detroit. As a protection to its own members, the Cohens, Schreiber of plaintiff company was not permitted to join Co-Operative but is now a member of another smaller buying vehicle called "Mutual", having as its affiliate mostly subsequent to "key run" houses.

Plaintiff, chiefly through testimony of Co-Operative's former manager, Ray Moon, who organized "Mutual", produced evidence of the monopolistic activities and control of Co-Operative in several instances, generally met by defendants' explanation that this was because of that particular theater's "superior economic position".

This court is convinced that Co-Operative controls the policy and really buys for all its members. Undoubtedly it tries in such purchases to satisfy its individual members but it can and does discipline exhibitors and producers alike. However,

---

[1] No opinion for publication.

because of public opinion, fear of possible litigation, or for other reasons of policy it has in some cases made concessions to an independent. Sometimes too the independent has an unique buying power of his own, such as Schulte in the Ferndale-Radio City controversy, to which Co-Operative bowed by a compromise agreement. But all in all plaintiff was able to establish that when left to his own resources an independent theater owner in competition with a Co-Operative member faces an almost insurmountable handicap.

This court was very liberal in admitting evidence of numerous other theater situations in the Detroit area where Co-Operative had acted improperly either in treatment of its own membership or other exhibitors.

The court considered this evidence as disclosing a comprehensive and complete picture of the moving picture industry and its operations in the Detroit area. Ever since Muller v. Oregon, 208 U.S. 412, 28 S. Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957, it has become increasingly apparent that where, in a private controversy, there are questions which may seriously affect public interest, the ordinary rules of evidence and relevancy need not always be followed. In cases involving statutes which are enacted principally for public protection the court must be alert to understand all of the economic and social factors which bear upon the result—particularly in cases where there has been no direct intervention, by the government. So it was obvious that this court could not decide what the legitimate scope of its activity should be without inquiring into all phases of the motion picture industry.

■ But plaintiff cannot rely on a showing of wrongs to others. It can rely only on a showing of injury to itself. Carbonic Gas Co. of America v. Pure Carbonic Co., D.C., 4 F.Supp. 992, 993; Ketchum v. Denver & Rio Grande R. Co., 8 Cir., 248 F. 106.

■ Plaintiff must show that defendants caused the injury to it, and the injury must be the proximate consequence of the acts of the defendants towards plaintiff and not towards others, and it is not enough to show that forbidden acts were committed. Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885; Gerli v. Silk Ass'n, D. C., 36 F.2d 959; Noyes v. Parsons, 9 Cir., 245 F. 689.

Therefore, though we permitted the parties to make an extended record, nevertheless this opinion limits its conclusions to the invaded rights of plaintiff only.

There are four legal points involved:

■ First, is defendant Co-Operative engaged in interstate commerce?

The admitted modus operandi is this: These film contracts, negotiated first in Detroit, are for pictures to be manufactured in California and are made even before the picture is started or perhaps the script written or actors selected. The market time for the next year is the end of the summer or early fall, but first the agreement must go to New York to be "accepted." The pictures when finished then come to the film exchange in Detroit and are leased to individual theaters for use. When the rental period is over the films are returned to the distributor who finally sends them to another state or back to headquarters.

This court believes that defendants are engaged in interstate commerce, and rejects defendants' theory that the activities are entirely intrastate and local in nature. We believe that the procedure is even more interstate commerce than in the Swift case (Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518), although no work is done in the State of Michigan upon these films. We emphasize that it is defendants' contracts with producers coupled with contracts from other states that give life and genesis to the film itself. Michigan is merely a stopping place or link in the chain in the interstate travels of these films from producers through distributor through exhibitor to the public and back the same route to the producer. This court believes this to be interstate commerce of a pure virgin variety and so holds, but we add the following references as conclusive authorities in our opinion: Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Real Silk Hosiery Mills v. City of Portland et al., 268 U.S. 325, 45 S.Ct. 525, 69 L.Ed. 982; Electric Bond & Share Co. et al. v. Securities and Exchange Comm. et al., 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; H. B. Marienelli, Ltd., v. United Booking Offices of America et al., D.C., 227 F. 165; Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; Greater New New York Live Poultry Chamber of Com-

merce v. United States, 2 Cir., 47 F.2d 156; Id., 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448; C. E. Stevens Co. v. Foster & Kleiser Co., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173; Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610.

We hold that Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Federal Trade Commission v. Bunte Brothers, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881; People of California v. E. W. Thompson, April 28, 1941, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219, have no application here.

The second question is that granting defendants engaged in interstate commerce, has there been violation of the Sherman Anti-Trust or Clayton Acts, plaintiff having dropped claimed violation of the Robinson Patman Law?

■ This court recognizes that defendant, Co-Operative, organized under laws of the State of Michigan (Section 98, et seq., Michigan General Corporation Act, Act 327, Public Acts of 1931; Section 21.99 et seq., Michigan Stat.Ann.) has a right to exist and to function when it does not violate any federal or state law.

■ Independent operators may organize for the reasonable promotion of their economic activity without violation of the Sherman law. This principle was clearly enunciated by the Supreme Court of the United States in Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, and has been consistently adhered to. This court is unable to agree with contention of plaintiff that the form of proprietary ownership may render theater chains immune from wrong doing whereas a co-operative enterprise doing the same thing would be violating the law. This would make the test of legality depend upon whether or not the proprietary interest existed in defendants as one. The Supreme Court of the United States obliterated this inequality and rejected this distinction which was urged in the Appalachian case, supra. Economic facts do not justify such a conclusion and this court would be receding from the findings of the Appalachian line of cases if it so held.

Here we are concerned with the federal law only and of course the mere fact that defendant, Co-Operative, legally exists in Michigan does not permit it to violate a federal law any more than laws creating corporations give rights to those corporations to ignore federal or state restrictions. Since, therefore, Michigan legalizes co-operatives and since here the members themselves are not protesting against its operations, we know of no law that will prohibit these independent theater owners designating anyone they desire to do their individual buying. If a member wants his Board of Directors or Manager to buy his pictures and thinks this an advantage, what law prevents such an arrangement? Booking organizations in the United States are almost as old as the theater. In the case at bar not only are defendant members apparently satisfied, but the producers and distributors, not made parties defendants, have not appealed here for relief from coercion.

Furthermore, how can this or any other court, recognizing the legal existence of Co-Operative, where members have placed buying power in their Board of Directors and Manager, prohibit the distributor from always having in mind that Co-Operative is buying for one hundred members? Or, if Co-Operative doesn't want to do business with some particular major what could this court do to compel such a contract? Then too, even though Co-Operative protested to each distributor that he was not to consider that Co-Operative was buying for one hundred theaters, by what feat of magic can a court black out known factors from consideration of the parties?

■ On the contrary, our courts have held many times that the distributor may sell to whom he desires and that he may provide for clearance or even not to sell to any other competing exhibitor at all until after the clearance period. Westway Theatre, Inc., v. Twentieth Century-Fox Film Corporation, D.C., 30 F.Supp. 830; Arthur v. Kraft-Phenix Cheese Corporation, D.C., 26 F.Supp. 824; Gary Theatre Company v. Columbia Pictures Corporation et al., 7 Cir., 120 F.2d 891, decided June 11th, 1941. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46; Id., 224 F. 566.

Let us pursue the matter further. If plaintiff thinks it is legal and proper for him to have a four to one advantage over

the independent with only one theater, why can't the independents get together under the Michigan Co-Operative Law to have an advantage over, or elevate themselves to an equal basis with, the small chain owner or the distributor as long as it, Co-Operative, uses that power legally?

Let us cite the Radio City-Ferndale controversy hereinbefore mentioned as an example. The facts are interesting. Schulte, who operates Radio City, controls twenty theaters. The owner of Ferndale, Ealand, stood alone and for years had all major pictures in Ferndale. He was a pioneer of the industry but with the building of Radio City—Ealand's Ferndale left alone would have become an inferior investment. The work of years would have been lost because Ealand faced by Schulte's superior buying power would have been gradually undermined. It was only Co-Operative that saved him. Here, we note, Co-Operative served a good purpose. But unfortunately Co-Operative began using its defensive weapons as swords by trying to keep Schulte from getting any real foothold in Ferndale. Eventually a compromise was effected but this court is not naive enough to believe that Co-Operative had any change of heart or policy. After all Schulte had a buying power of his own that distributors could not ignore and these distributors undoubtedly had something to do with Co-Operative's partial capitulation. And then there was public opinion to be considered since Ferndale, a thriving young community just outside of Detroit, might through its chamber of commerce, have focused a searching spotlight upon Co-Operative's unfair activities in their vicinity, something no monopolistically inclined organization willingly invites. We cite this specific instance, however, to indicate that there are two sides to this question—first, that Co-Operative can and does protect the independents who would otherwise be helpless; and second, that Co-Operative does, at times, go too far in extending this "protection".

We can therefore see no objection to Co-Operative buying for its members and can think of no restrictions that will render the distributor unconscious of the fact that Co-Operative has buying power of some magnitude. So that even though Co-Operative denies that it did this, this court finds that it uses that power continually and holds it has a right to do so as long as it does not use it illegally.

But it must be noted that we always recognize defendant Co-Operative's right to function only when it does so legally and it is our opinion that its operations have not always been legal. We believe that the evidence further shows that defendant has violated the Sherman Anti-Trust Act on several occasions. This is particularly true when it stifles all competition by coercing distributors to break contracts as it did in one instance (not affecting plaintiff) or when it compels distributors not to do business with anyone outside the select gates except after the clearance run, on penalty of not being able to sell Co-Operative at all.

Let us make it clear that this court does not desire to interfere in any way with clearance or with contracts that can be legally made. Plaintiff's counsel and nearly all the witnesses admitted that this was a part of the business situation. And we concede that the distributor has the right to sell to whom he pleases and under such terms as he pleases. We also recognize that the consent decree recently filed in the New York District Court in the case of United States v. Paramount Pictures, M.G.M., R.K.O., 20th Century Fox and Warner Brothers (filed November 20, 1940), aims at correcting the evil of an independent being unable to get major films and may tend to eliminate some of this too frequent type of litigation. As a matter of fact, the evidence shows that a competing new theater, the Midtown, has already invoked its provisions against both plaintiff and Cohen theaters on Woodward Avenue involved in this suit. If the buying power of the Cohens is successful with or without Co-Operative in getting the better deal from the distributors in a competitive situation, this court cannot grant relief from such a result. Plaintiff cannot complain of the effect of economic factors which it recognizes as operative and which are accepted as the Norm of business dealing in the industry. Gary Theatre Co. v. Columbia Pictures Corp. et al., supra. However, it is apparent that the boldness of Co-Operative had reached a point where it was somewhat arrogant in its attitude towards out-of-the-fold independent and even small theaters in its own membership. In some instances the independent went to the wall or had to sell out. And this court believes that when Co-Operative or any member seeks to prevent a member's competitor from bidding for pictures by threats held over the producer; or when a

member buys pictures which are not needed for his "normal" requirements; or when an association so conducts its affairs as to shut out one member's competitor entirely without rhyme or reason; then the line has been crossed between legality and illegality. The eight major companies produce as herein stated about four hundred full length films. The evidence shows that the Roxy runs twenty-four hours a day, has three changes of double bills a week and on that schedule requires three hundred and twelve features each year. The evidence shows that only one major, Warner-First National, splits its products evenly between plaintiff and the Cohens. Plaintiff also gets part of the other majors when not purchased by Co-Operative. In competition with the Roxy running twenty-four hours a day its Colonial can't exist without vaudeville. Add to this that the Roxy is practically the only key run house in Co-Operative using six features a week and it must be apparent that its "abnormal requirements" above its "normal needs" are depriving Colonial of any chance to exist as a moving picture house alone.

 So we hold that plaintiff may and should be permitted to go into open competition for any pictures that any major has to sell. We hold further that the normal needs of the Cohens even in the present era of "double bills" which, all parties agree are useless, needless, a hindrance, and a detriment to the industry, should not be more than two hundred and eight pictures a year for each theater, which would leave a hundred and fifty or two hundred majors that plaintiff should have little trouble in purchasing even though the Cohens always be given first choice by distributors. To hold otherwise would be to violate the essential aim of the Sherman Act which is to prevent exclusion. National Cotton Oil Co. v. Texas, 197 U.S. 115, 25 S.Ct. 379, 49 L.Ed. 689; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734; Paramount Pictures, Inc., v. United Motion Picture Theatre Owners, 3 Cir., 93 F.2d 714; United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403; United States v. First National Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Youngclaus v. Omaha Film Board of Trade, D.C., 60 F.2d 538.

This court maintains that there is a distinction between using your power to make a legal contract and using your power to make an illegal one in restraint of trade and we think that Co-Operative went beyond the pale of its legal rights. To the extent of such exclusion plaintiff has grounds to complain that defendants have acted unlawfully towards it.

The third question is important because even though defendants are engaged in interstate commerce and have violated the Sherman Anti-Trust Act or Clayton Act, is plaintiff entitled to damages?

The court holds that plaintiff is not entitled to damages for several reasons—the first being that plaintiff has not proven damages.

We believe and so hold that there is much to what defendants claim in urging that plaintiff has only shown what its damages would be if it, plaintiff, had gotten all major products and the Cohens had gotten none. In fact defendants use these figures to fortify their contention that plaintiff doesn't want "free competition", but really wants "preference" over the Cohens. Defendants insist that this is so obvious that this court should not concern itself with a disagreement between two local theater groups trying to annihilate each other. The evidence therefore does not help this court in arriving at a conclusion on damages, although if "the amount" were the only question involved we would have asked for further testimony.

 There are, however, more compelling reasons for not allowing damages. As previously mentioned, Schreiber, of plaintiff company, was formerly a member of Co-Operative. He has been in the theatrical business in Detroit for years. He knew the workings of Co-Operative before he purchased the Woodward Avenue group from his Uncle. He went into a situation he knew existed. Even the consent decree recognizes that rights of new exhibitors to pictures is somewhat controlled by the situation "as is" when the new exhibitor comes on the scene.

Here it is not the case of an independent theater owner, already operating, being

driven to the wall by a monopolistic trust. In short, stripped of all oratory and fiction it must be admitted that there are no halos of equity or innocence decorating the brow of plaintiff because when he was a member of Co-Operative it was only when its policy in one single instance did not coincide with his desires did Mr. Schreiber resign. Even before the day he purchased the theaters he knew the Cohens controlled the Roxy and Mayfair, knew the policy of Co-Operative, and had contributed to that policy as one of its members. Then too, the chief damage to plaintiff came because the Roxy used too many pictures on its schedule—but after all, this was its schedule when plaintiff first bought its theaters. So plaintiff may not have known that what had happened to others in competition with Co-Operative was going to happen to him in such quantity, but he surely knew that Co-Operative "protected" its members even if it had to bend the anti-trust laws a little to do it. As a member he had helped to "protect" other members. But in considering damages we must bear in mind that there is an element of pari delicto in plaintiff's position which is comparable to that found in Eastman Kodak Co. v. Blackmore, 2 Cir., 277 F. 694.

■■■ Mutual, of which plaintiff is now a member, is a similar organization to Co-Operative except as to some difference in its contracts, and although this court is not here concerned with what is or is not sportsmanship, it should not levy damages upon a wrongdoer for the benefit of one who claims injury for infringement of the anti-discrimination, restraint of trade, and Sherman Anti-Trust Act of the United States when that action is based upon refusal of defendant wrongdoer to permit plaintiff to participate in defendants' activities. Bluefield's Steamship Co. v. United Fruit Co., 3 Cir., 243 F. 1. Courts do not permit a plaintiff to blow hot or cold with illegality. First National Pictures v. Robison, 9 Cir., 72 F.2d 37, certiorari denied 293 U.S. 631, 55 S.Ct. 141, 79 L.Ed. 716; Bishop v. American Preservers Co. et al., 7 Cir., 105 F. 845; United Fuel Gas Co. v. Railroad Commission, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390.

See also Grzelka v. Chevrolet Motor Co., 286 Mich. 141, 281 N.W. 568, 570. The statement appearing in the last cited case that plaintiffs "took their chances and they cannot complain" was applied by our own Court of Appeals in Equity in the case of Continental Securities Company v. Michigan Central Railroad Company, 6 Cir., 16 F.

2d 378, 379, where Circuit Judge Denison pointed out that plaintiff could not be heard to complain "of the burden which it voluntarily and intelligently assumed * * *." See also Buckeye Powder Co. v. E. I. Du Pont de Nemours Powder Co., 3 Cir., 223 F. 881, affirmed 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123; Bishop v. American Preservers Co. et al., supra.

May we also add that while plaintiff did not formally waive damages, it is perfectly clear that it considered damages of secondary consideration. In fact during the course of trial plaintiff indicated that it would have been willing to forego damages if certain injunctive relief were obtainable. And this court became convinced from the various attitudes expressed at the trial and a consideration of the whole case that plaintiff was not interested essentially in damages so long as it got a clear understanding for the future (Transcript 1228). Nor is this court impressed by large claims for damages such as asserted here and which are passed off so lightly. The testimony clearly shows that plaintiff did have a harder time making money than the Cohens and it had to resort to some extreme showmanship and tactics to do so. But the business of plaintiff has been fairly profitable with large indebtedness liquidated and paid off, leasehold amortizations taken care of, and substantial salaries paid. These facts do not coincide with the asserted claim of the helpless victim who is threatened with ruination.

The fourth and final question involved is—has this court the right to grant injunctive relief for violation of the Sherman Anti-Trust Act and Clayton Act affecting plaintiff, when the court has denied plaintiff damages; and just what the nature of such injunctive relief can be?

Section 16 of the Clayton Act reads in part as follows: Section 16 of the Clayton Act, 15 U.S.C.A. § 26. "Any person * * * shall be entitled to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws, * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity * * *."

■■■ The position of the court in this matter we believe has been made plain. In some cases Co-Operative is worthy and has given valuable service to its members in many ways. On the other hand, since it

threatens to continue to over-play its hand, should this not call for some legal prevention?

How then can this court help? The moving picture business is a difficult enterprise to handle. This is well known to all who have become involved in its many intricacies. In the case at bar it must be remembered that to deny plaintiff any future relief on the theory that it is not entitled to damages now may be construed as placing this court's approval upon all activities of Co-Operative. This is not our intention. Perhaps the remedy is one that should be left entirely to the government, watchful of the practical workings and results of the consent decree. However, plaintiff in this case has presented certain facts which we believe to be violations of the Sherman and Clayton Anti-Trust Acts. In a way it has rendered a public service. Yet there is nothing of record to show that defendants do not intend to continue with these same violations in the future. On the other hand, the Clayton Act gives this court the right to restrain "threatened conduct". Perhaps past history of the moving picture industry in Detroit, including interpretations of existing decisions did leave "reasonable doubt" in Co-Operative as to just what its rights were in this chaotic industry. We don't know. But this court is willing to forget the past because of those uncertain conditions and give all parties the right to start over. In any event, a wrong in which the public is interested should not be permitted to continue and although the right of this court to grant any injunction without allowing damages may be questioned, we nevertheless decide to err, if at all, upon the side of what we believe to be fairness and common sense. We therefore decide that an injunction may issue:

First, to prevent defendants and each of them, directly or indirectly, from interfering with plaintiff's right to compete for the purchase of any and all motion picture films produced whether such films are used or purchased by the Cohen competing theaters or not;

Second, to prevent defendants and each of them by coercion, threat, or otherwise from restraining any producer or distributor, directly or indirectly, from negotiating with plaintiff or from entertaining bids from plaintiff for any or all pictures, and

Third, restraining the Cohens from purchasing more than the number of major pictures for either the Roxy or Mayfair theaters normally used by theaters in their respective runs which at the present time we place at two changes of double features each—each week.

May we not make this further observation? We believe that the consent decree entered into by the New York court is a step in the right direction. Whether it will actually work out in practice is a question but its weakness is that it seeks solution of a situation presenting at least three main view points by reflecting only two. There is a three cornered relationship in the moving picture industry—(1) between producer and exhibitor, (2) between exhibitors relating to division of product, clearance and protection, and (3) both of these situations as to the federal government concerning violations of the Sherman and Clayton laws. Difficulties will still arise unless all of these interests are subserved and kept in mind and until some harmonious system is developed the courts will continue to be burdened with litigation and this phase of the industry will remain more or less chaotic. In McCarroll v. Dixie Lines, 309 U.S. 176, 60 S.Ct. 504, 84 L.Ed. 683, Mr. Justice Douglas commenting on the economic confusion which has been created by the system of state taxes on goods traveling across state lines suggested a nation wide survey. This furnishes us with some precedent for making a suggestion here.

Courts are limited in what they may decree but we feel that a National Board of Zoning, Clearance and Protection with regional offices throughout the United States might well be set up with a carefully chosen membership so that various delicate problems presented in a very complicated industry could be given proper consideration. The powers of that Board should be manifold since there is need for a program instituted by the government along these lines. In addition, the industry itself should devote further time to the study of the means of self-improvement.

A decree in accordance with this opinion may be prepared. Costs are allowed plaintiff.