## UNITED STATES v. NATIONAL RETAIL LUMBER DEALERS ASS'N et al.

### No. 9337.

District Court, D. Colorado.

July 11, 1941.

452

James McI. Henderson, Sheridan Morgan, John W. Porter, and S. L. R. McNichols, all of Denver, Colo., for the Government.

Charles M. Price, Merrill A. Russell, Robert C. Keck, and Scott, MacLeish & Falk, all of Chicago, Ill., Quigg Newton, Jr., Richard M. Davis, Terrell C. Drinkwater, Newton, Davis & Drinkwater, Clyde C. Dawson, Jr., Pershing, Bosworth, Dick & Dawson, Horace F. Phelps, Benedict & Phelps, Wm. A. Bryans, III, and Lee, Shaw & McCreery, all of Denver, Colo., William R. Kelly, of Greeley, Colo., Frank H. Hall, of Trinidad, Colo., Raymond M. Sandhouse, of Sterling, Colo., W. Richard Means, of Denver, Colo., Howard T. Fleeson and Carl G. Tebbe, both of Wichita, Kan., Brooks & Fleeson, of Wichita, Kan., John E. Gorsuch, of Denver, Colo., and Clarence A. Swainson, of Cheyenne, Wyo., for defendants.

SYMES, District Judge.

The defendants are (1), the National Lumber Dealers Association, its officers and members, numbering in all 23,000 throughout the United States, referred to hereafter as National. (2), Mountain States Lumber Dealers Association, referred to as Mountain States, its officers and members, consisting of 475 retail lumber dealers doing business in Colorado, Wyoming and New Mexico. (3), retail lumber dealers, doing business in Colorado, Wyoming and New Mexico, and members of the defendants National and Mountain States. (4), two cement manufacturers, doing business in Colorado, Wyoming and New Mexico.

The indictment charges that over 80% of the lumber and lumber products consumed in Colorado, Wyoming and New Mexico is manufactured outside those states and is shipped in in interstate commerce. The same is true as to asphalt, building paper, wire products, metal lath, plaster and lime, and 80% of the cement consumed in Colorado, Wyoming and New Mexico is produced by the two defendant cement manufacturers at plants located in Colorado and Wyoming.

In the first count defendants are charged with having conspired "to establish, maintain, and enforce an agreed upon * * * policy and program of distribution * * * restricting the channels of distribution through which said lumber, lumber products, cement, and other building materials used and consumed within the States of Colorado, Wyoming and New Mexico move and are transported in interstate commerce * * * for distribution to the consuming public, for the purpose and with the intent of * * * eliminating, restricting, and preventing competition in the trade."

It was part of the conspiracy that the defendants would eliminate the competition of the manufacturers and wholesalers for the business of contractors, builders and other consumers, with the exception of governmental agencies. That the defendants force such ultimate consumers to buy lumber and lumber products from so-called "recognized" "legitimate" retail dealers whose business entitles them to membership in the defendant Mountain States. And that they set up and establish the defendant retail lumber dealers mentioned in the indictment, and other retail lumber dealers approved by the defendant Mountain States, as a class of "recognized" dealers within Colorado, Wyoming and New Mexico, and unreasonably confine the sale of lumber and lumber products and building materials by the manufacturers and wholesalers thereof, to or through the sole medium or agency of defendant retail lumber dealers named in the indictment exclusively, and prevent ultimate consumers and purchasers in Colorado, Wyoming and New Mexico from buying, shipping and receiving lumber or lumber products and building materials from any manufacturer or wholesaler thereof, and prevent any of the described manufacturers and wholesalers from quoting prices, or selling or shipping lumber and lumber products and building materials to any ultimate consumer or purchaser in any of the states mentioned.

That the defendants would suppress and lessen competition between retail lumber dealers and prevent nonrecognized retail lumber dealers and other sellers from buying, securing or receiving lumber or lumber products, or building materials direct from

said manufacturers and wholesalers, or any of the same, in order to compel said competitors to purchase their requirements from or through the defendant retailers exclusively, upon terms and conditions which afford a commission or profit to such defendant retail lumber dealers and other recognized lumber dealers, and to interfere with the business and trade in lumber and lumber products of other dealers not recognized by the defendant Mountain States, to enable or assist the defendant lumber dealers to appropriate and acquire the patronage, trade and business of such nonrecognized lumber dealers, and force the ultimate consumer to buy from the defendant retail dealers, and other dealers recognized by the defendant Mountain States, operating a retail establishment nearest to the point where such lumber products were to be used.

Count 2 charges the defendants with having conspired to monopolize, control and dominate a part of the trade and commerce among the several states of the United States in lumber, lumber products, cement and building materials, and that part of such trade and commerce located in the states of Colorado, Wyoming and New Mexico.

The means and methods by which the conspiracy was intended to be carried out are set out as follows: That the defendant National, acting in concert with the regional member associations, and other defendants, have formulated and adopted so-called "distribution statements" setting forth a plan and program of controlling the distribution of said products and materials, arbitrarily classifying consumers and purchasers, and allocating and dividing the classifications among the manufacturers, wholesalers and retailers. That agreements would be obtained from manufacturers and wholesalers to adhere to the distribution plan, and manufacturers or wholesalers not agreeing to adhere to the plan would be boycotted. That they would hold meetings of defendant members, National and Mountain States, at which ways of coercing manufacturers and wholesalers into the distribution plan were formulated. Manufacturers or wholesalers who did not adhere to the plan would be boycotted.

Appointment of committees to call upon manufacturers and wholesalers to induce them to adhere to the distribution plan, and creating of committees to complain to the manufacturers and wholesalers of violations of the plan, and to obtain from them fines to compensate for such infractions.

The defendants National and Mountain States would adopt a standard for determining whether a retail dealer was to be designated as "recognized". The standard was that the retail dealer would adhere to their policies, not cut prices, nor invade the territory of a recognized dealer, and refrain from unnecessary or excessive competition with recognized retail dealers, and the publication by Mountain States of a directory of recognized dealers.

That retail dealers would be confined in their sales and deliveries to a particular area, in which such dealer would have competition from no retail lumber dealer not in that area.

That the defendant cement manufacturers would include a condition in the bill of lading that cement shipments could not be diverted while in transit to a retail dealer consignee, thus to prevent sales and deliveries by retail dealers to areas other than his particular assigned area.

The essentials necessary to prove violation of the Sherman Anti-Trust Act are (1), the existence of concerted action to accomplish; (2), an unreasonable restraint; (3), of trade or commerce; (4), among several states. Paragraph 26 of the indictment is the charging paragraph and contains this language: That the defendants well knowing all the facts, have been and are now engaged in a wrongful and unlawful combination and conspiracy to establish, maintain and enforce an agreed upon, arbitrary, artificial and unreasonable policy and program of distribution, thereby restricting the channels of distribution through which said lumber, et al., and other building materials used within Colorado, Wyoming and New Mexico move and are transported in interstate commerce, as hereinbefore set forth, for distribution to the consuming public, "with the intent of unlawfully and unreasonably eliminating, restricting and preventing competition in the trade and commerce aforesaid." All in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1.

This is further elaborated in paragraph 27, charging that it has been and now is part of the said conspiracy that the defendants unreasonably eliminate all competition from manufacturers or wholesalers for the trade of contractors, builders, or other users of lumber, lumber products, cement and other building materials within the said three states. And that the defendants force the ultimate consumer, with a

few exceptions, to buy from recognized, regularly established retail lumber dealers, whose business is such as to entitle them to membership in the Mountain States, and that the defendant retail lumber dealers, and other dealers approved by the Mountain States, be established as a class of "recognized" lumber dealers within the states of Colorado, Wyoming and New Mexico, and unreasonably confine and restrict the sale and distribution of lumber, lumber products, cement and other building materials by the manufacturers and wholesalers, through or to the sole medium of the retail lumber dealers named herein. And that the defendants prevent such ultimate consumers or purchasers in the three states mentioned from buying or receiving any lumber or building materials from any manufacturer or wholesaler thereof, and prevent the wholesalers or manufacturers from selling or shipping lumber or building products to any ultimate consumer in any of the three states. And that the defendants suppressed and eliminated competition between the retail lumber dealers by unlawfully, rigidly and arbitrarily controlling the act, procedure and process by so-called recognition of retail lumber dealers, on the part of the defendant Mountain States. And that the defendants require or compel manufacturers and wholesalers to cease from soliciting trade or quoting prices to nonrecognized competitors of the defendant retail lumber dealers and prevent their competitors, to wit, the nonrecognized lumber dealers, from buying lumber or building materials direct from the manufacturers and wholesalers, in order to compel said competitors to purchase their requirements from the defendant recognized retail lumber dealers exclusively; whereas but for such unlawful conspiracy such consumers and purchasers could buy at reduced prices from dealers located at other points in other states.

The Addyston Pipe case, Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, held interstate commerce includes not only the transportation of persons and property, but also the purchase, sale and exchange of commodities, the power to regulate which is vested in Congress, and that when Congress enacted statutes, such as the Sherman Act, any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation and delivery of an article of interstate commerce by preventing or restricting its sale, thereby regulates interstate commerce to that extent and violates the statute. And when the direct, immediate and intended effect of a contract or combination among dealers in a commodity is the enhancement of its price, it amounts to a restraint of trade in the commodity.

At page 241 of 175 U.S., 20 S.Ct. at page 107, 44 L.Ed. 136, of that case (supra), the Court set out a state of facts a good deal like those heretofore recited from this indictment, and said: "If dealers in any commodity agreed among themselves that any particular territory bounded by state lines should be furnished with such commodity by certain members only of the combination, and the others would abstain from business in that territory, would not such agreement be regarded as one in restraint of interstate trade? If the price of the commodity were thereby enhanced (as it naturally would be), the character of the agreement would be still more clearly one in restraint of trade."

And further on (175 U.S. page 244, 20 S.Ct. page 108, 44 L.Ed. 136), the Court had this to say: "We have no doubt that where the direct and immediate effect of a contract or combination among particular dealers in a commodity is to destroy competition between them and others, so that the parties to the contract or combination may obtain increased prices for themselves, such contract or combination amounts to a restraint of trade in the commodity, even though contracts to buy such commodity at the enhanced price are continually being made."

In Eastern States Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788, Mr. Justice Day also recited a state of facts similar to those at bar, stating it was a case where wholesale dealers engaged in interstate trade, upon whom it was proposed to impose as a condition of carrying on that trade that they shall not sell in such manner that a local retail dealer may regard the sale as an infringement of his exclusive right to trade, upon pain of being reported as an unfair dealer to a large number of other retail dealers, the purpose being to keep the wholesaler from dealing not only with the particular dealer who reports him, but with all others who may be informed of his delinquency, and the Court says, 234 U.S. page 611, 34 S.Ct. page 954, 58 L.Ed. 1490, L.R.A.1915A, 788:

"Section 1 of the act [Sherman Act] * * * is not confined to voluntary re-

straints, * * * · but includes as well involuntary restraints, as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce, or restrict the common liberty to engage therein."

In the opinion of the lower court (D.C., 201 F. 581), which was affirmed, it was said that while a retail dealer acting individually has a right to choose from whom he will buy, and may impart to anyone else anything he may know about the business methods of anyone, yet several dealers may not combine into an association in order to acquire and distribute knowledge about the business methods of others, by means of circulation among themselves of reports such as these. That so to do is a violation of the Sherman Act, and the court goes on to say it is well settled that restraint of trade, as used in the Act, is to be construed as including "restraint of competition."

In the Socony case, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, at page 223, 60 S.Ct. 811, at page 844, 84 L.Ed. 1129, the Supreme Court said: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se."

The charge in the indictment that wholesalers and manufacturers were to be prevented from selling and shipping directly to consumers by persuasion, acquiescence and boycott, is a conspiracy within the scope of the Sherman Act. Binderup v. Pathé Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308. Nor is the amount of commerce involved material. United States v. Socony-Vacuum Oil Co., supra, note at page 225 of 310 U.S., 60 S.Ct. 811, 84 L.Ed. 1129.

In the General Motors case, United States v. General Motors Corp., 7 Cir., 121 F.2d 376, decided May 1, 1941, the court held any conspiracy which operated to force unreasonable terms and conditions upon independent traders and to impose control restrictions upon their trading is coercive conduct, and unnecessarily burdens the interstate trade and commerce in their particular product and unduly limits their liberty to do business in the interstate markets. The court points out the theory back of the Sherman Law is to protect the free movement of goods in interstate commerce against unreasonable restraints, to assure open interstate markets where traders may freely negotiate sales and to preserve the normal competitive forces which otherwise might operate in these markets.

True, as argued, paragraphs 26 and 27 of the indictment before us do not use the words "coerce" or "intimidate", but paragraph 30 specifically charges that by "coercive and concerted action, boycott, threats of boycott and other joint and united action against * * * manufacturers and wholesalers", pledges and other promises were sought and exacted from said manufacturers and wholesalers that they would adhere to and enforce the conspirators' plan and program of distribution control, to compel them to so agree to and enforce the plan. With this in mind it is hard to understand the emphasis of the reply brief that intimidation and coercion, or other similar unlawful means are not charged. An examination of the cases cited in the reply brief do not sustain the point as to what words are indispensable as descriptive of a legal means to be used to attain the object of a conspiracy. In Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A. L.R. 196; Wholesale Grocers' Ass'n v. Federal Trade Commission, 5 Cir., 277 F. 657; Paramount Pictures v. United Motion Picture Theatre Owners, 3 Cir., 93 F.2d 714, and the Eastern States case, supra, language similar to that in the indictment before us was held sufficient to sustain the charge. We refuse to admit the magic of any particular words as necessary to the validity of an indictment. It is sufficient to set out the crime charged in simple, plain language.

As stated in the General Motors case, supra: "* * * such a conspiracy as here shown violates the Sherman law, for it operates to force unreasonable terms and conditions upon independent traders and to impose control restrictions upon their trading, coercive conduct which necessarily burdens the interstate trade and commerce in their product and unduly limits their liberty to do business in the interstate markets." See Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L. Ed. 308; Loewe v. Lawlor, 208 U.S. 274, at pages 293, 294, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; United States v. Patten, 226 U.S. 525, 541, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325.

"The crime of restraining interstate commerce through combination is not condoned by the inclusion of intrastate commerce as well." United States v. Brims, 272 U.S. 549, at page '553, 47 S.Ct. 169, at page 170, 71 L.Ed. 403.

And Indiana Farmer's Guide Co. v. Prairie Co., 293 U.S. 268 syllabus 2, 55 S. Ct. 182, 79 L.Ed. 356, holds: "To constitute a combination to restrain or monopolize a business in interstate commerce, within the meaning of §§ 1 and 2 of the Sherman Act, it is not necessary that the restraint or monopoly should affect all of the business of the kind throughout the country; it may relate to such part of it as is carried on in a particular section of the country."

Count 2 adopts by reference the allegations of paragraphs 1 to 25 and 28 to 36, inclusive in full from Count 1 of the indictment. It then charges that the defendants have conspired to monopolize and dominate a part of the trade and commerce among the several states of the United States, in lumber, lumber products, cement and other building materials described in Count 1, in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2. That is to say, that part of the trade of contractors, industrial concerns and other consumers in Colorado, Wyoming and New Mexico, which but for the use of those means by the defendants, as aforesaid, would have been retained by them, said means being, as in count 1, shown and charged, unreasonable and unlawful as against said manufacturers, wholesalers, nonrecognized retail lumber dealers, vendors, and other sellers, and of such a nature as to exclude them from engaging in that part of said interstate trade and commerce; contrary to the statute.

 The essential characteristic of monopoly is the wrongful exclusion of competitors from the field. A conspiracy to monopolize is a conspiracy to get control of the industry in which the defendant is engaged, by means which prevent others from engaging in fair competition with them. In other words, taking over of the business as far as may be by a selected few conspirators. In the note to United States v. Socony-Vacuum Oil Co., supra, 310 U.S. page 226, 60 S.Ct. page 845, 84 L. Ed. 1129, it is said:

"But the crime under § 1 is legally distinct from that under § 2 [citing cases] though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." (Citing cases).

The accepted definition of conspiracy is: "A combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful by criminal or unlawful means." Duplex Printing Press Co. v. Deering, 254 U.S. 443, at page 465, 41 S.Ct. 172, at page 176, 65 L. Ed. 349, 16 A.L.R. 196.

 In the briefs of certain defendants it is stated that where the act to be accomplished is not criminal in itself, the indictment must allege the defendants conspired to violate the act by means which are criminal or unlawful. We are of the opinion the acts to be done by the defendants are unlawful in themselves under the Sherman Act. That is, are criminal and unlawful per se. See quotation from Socony-Vacuum case, supra, 310 U.S. page 223, 60 S.Ct. 811, 84 L.Ed. 1129. A good deal of the argument in opposition is, consciously or unconsciously, bottomed on the doubt apparently in the mind of the pleader that the Government will be unable to prove all of the allegations of the indictment, a matter immaterial at this stage of the case.

Counsel reiterate the old argument that lumber dealers are not prohibited from formulating, promoting and advocating by all lawful means a policy or program for the marketing of lumber and building material; that the matter of proper and economic distribution of lumber and building materials has been the subject of discussion by trade associations and by business men through their associations who have tried to formulate what they felt to be the proper method of distribution, so that such articles would flow to the consumer in an orderly manner; that there is nothing unusual about it and it has always been considered ethical and proper. Further that there is nothing reprehensible in retail dealers, either individually or through their trade associations, recommending and advocating to their suppliers that the retail dealer is entitled economically and morally to be the agency through which lumber and building materials are distributed locally, and that there is nothing reprehensible in building material dealers, through associations, advocating with manufacturers and wholesalers the reasons why lumber and building materials should be distributed through local retail yards and not direct by

the manufacturer or wholesaler to the consumer, or through dealers carrying adequate stocks to serve the community. And finally, that retail dealers as a group are entitled to advocate a policy or plan of distribution to their benefit, which is most beneficial to them "by fair and reasonable means."

■■■ The correctness of this argument cannot be gainsaid. It uses repeatedly the expression "by fair and reasonable means." But we cannot accept defendants' definition of what fair and honorable means are. For as long as their methods are bottomed on that the law can have no quarrel with defendants. However, that is not the charge. The scheme set out in this indictment can hardly be designated "fair and honorable", or "reasonable", as the courts have distinctly and repeatedly held; for no group in any industry can arrogate to themselves the power to say that the wholesalers and manufacturers in their particular industry may not sell direct to the consumer, nor compete with the retailer, and thus interfere with the orderly flow of the commodities mentioned to the ultimate consumer. Nor may they decide who shall deal in building materials, or at what price they may sell lumber, cement, etc. As stated in the General Motors case, supra, "The appellants were not justified in remedying the extremely competitive situation existing at that time by resort to unlawful activities."

Business methods violative of a specific mandate of a statute enacted by the Congress and interpreted as fully and often as the Sherman Act has been by the Supreme Court, cannot be designated "fair and reasonable", especially when as charged, the business men referred to seek by concert of action to force the manufacturer and wholesaler by intimidation and coercion to distribute their product in a particular way against their will. So to do is to violate a law which has been on the statute books longer than any of these defendants has been engaged in the business, and with which we must assume they were familiar.

There can be no question but that the methods alleged in paragraphs 26 and 27 were sufficient to coerce the manufacturers and wholesalers to distribute lumber and building materials in interstate commerce in a particular manner. How much the Government can prove is another matter.

■■■ Furthermore, it is specifically charged that those who did not adhere to the plan of the alleged conspirators would suffer loss and injury in their business, with a resulting direct interference and effect upon the free flow of interstate commerce. Paragraph 27 specifically says the defendants "Unreasonably eliminate all competition from manufacturers and wholesalers for the trade of contractors."

The methods by which this elimination would be brought about are clearly stated. Specifically they would not quote prices or ship lumber or building materials to unrecognized dealers, and how this would be done is a matter of proof not required to be pleaded. United States v. Patterson, D.C., 201 F. 697, holds the Act is sufficiently clear in its denomination as a criminal offense the attempt to monopolize with any other persons any part of interstate trade or commerce. Furthermore, it must be borne in mind that the rule of reason of the Standard Oil case, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, '55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734, has been overruled by United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and the Socony-Vacuum Oil Co. case, supra.

But if this were not enough, attention is called by paragraph 40 of Count 2 of the indictment as printed, that the defendants have conspired to gain for themselves that part of the trade and commerce aforesaid, comprising the trade of contractors, industrial concerns and other consumers aforesaid, in Colorado, Wyoming and New Mexico which, but for the use of those means by the defendants as aforesaid, would have been secured or retained as a matter of lawful right by the divers corporations, firms and individuals, comprising manufacturers, wholesalers, nonrecognized retail lumber dealers, etc. Clearly a charge, which if proved, establishes the effect of the conspiracy upon the nonrecognized retailers.

■■■■ The argument is made that no court has said the attempt to secure the business of a particular customer, or even of all prospective customers constitutes a monopoly, or attempt to monopolize. The answer is, as the authorities cited point out, under the Sherman Act two or more persons may not seek to do in concert what they may lawfully do separately. Furthermore the policy behind the anti-trust legislation is the maintenance of freedom in interstate commerce by forbidding monopolistic and other tendencies destructive of it.

Paramount-Famous-Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, and the Socony-Vacuum Oil Company case, supra.

True, before a combination or conspiracy can be considered violative of the Anti-trust Act it must, by its nature, result in interference with the free flow of commerce, or the means used to achieve it must have that effect. And while a combination to control the price, or conditions, or sale of articles which never were a part of the flow of interstate commerce, or after they had ceased to be a part of it, and come to rest, there is no violation of the statute, but this does not mean, as was contended at the oral argument and in the briefs, that men engaged in purely local activities can never fall afoul of this law, for local though an activity may be, if, through its object, or the means used to attain that object, it interferes directly with interstate commerce, the law is violated. Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Patterson v. United States, 6 Cir., 222 F. 599; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; United States v. Brims, supra.

In the light of these principles the four indictments under consideration individually allege that the aim of the combination or conspiracy was to obstruct interstate commerce, or that means were used that would have that result necessarily. We have already discussed and need not repeat the charges in the indictment that brings our case within these authorities. We might add that in Patterson v. United States, supra [222 F. 600], it is held:

"8. To bring a conspiracy within Act July 2, 1890, § 1, it is not essential that its execution be of any benefit to the conspirators; it being sufficient that it will be in restraint of another's interstate trade or commerce."

"9. Under Act July 2, 1890, § 1, relative to conspiracies in restraint of interstate commerce, the extent of the interstate trade or commerce conspired against is immaterial, and a conspiracy between the officers and agents of one competitor on its behalf to restrain a single interstate sale or ship-

ment by another competitor is covered by it."

"13. While but one competitor can make a sale, and though there can be no monopolizing within Act July 2, 1890, § 2, in making a single interstate sale, or a great number of sales, though wrongful means are used in making them, one competitor monopolizes interstate trade and commerce by excluding all or substantially all other competitors from the free opportunity of approaching each and every prospective purchaser on equal terms, or by driving them from the field of freely offering their goods, so as to have that field to himself."

"14. Within Act July 2, 1890, § 2, prohibiting the monopolizing of any part of the trade or commerce among the several states, 'any part of interstate trade or commerce' embraces the interstate trade or commerce of all prospective purchasers of a particular commodity in the United States, or in some particular portion thereof, but excludes the interstate trade or commerce of a particular prospective purchaser of a particular commodity."

If the conspiracy set out shows, as we think it does, a plan to force unreasonable terms and conditions upon the independent dealer engaged in selling lumber and building products and to impose control restrictions upon their trading, the law is violated. Clearly the language is as strong as that used in the Eastern States case, supra, and Lawlor v. Loewe, 235 U.S. 522, 35 S. Ct. 170, 59 L.Ed. 341.

The opinion in United States v. General Motors Corp., supra, is unique, in that the evidence is set forth in great detail, together with a detailed and extensive discussion and comment of the numerous authorities cited.

True the opinion was written after the trial, and the court had the full record before it. But assuming, as we must, the allegations of our indictment to be true, a jury can, as there stated, interpret the same in the light of all the circumstances and rely upon inferences naturally flowing from the evidence as a whole and would be warranted in attaching the coercion label to the action adopted by defendants in the case at bar. The court points out how the restrictions imposed upon thousands of General Motors independent dealers, tended to reduce the supply of General Motors cars in the channel of commerce and trade, and did impede the free flow of

that commerce from the factory to the ultimate car owner. So in the case at bar it is not hard to visualize the effect the methods charged had upon the free flow of lumber and building materials from the manufacturing plant to the ultimate consumer. And continuing, the court points out the appellants, General Motors, sought to justify their coercive course of business on the ground that it was superior and justified by their fear that unregulated dealers' financing would promote certain trade evils set forth.

The opinion then points out that it is doubtful whether regulation of the motor business should be entrusted to the dominant manufacturers, especially when they stand to gain by discriminatory treatment in favor of the discount companies in which they have a private interest. Next it deals with the question of whether the movement of the cars between the factory and the dealer affects the retail purchaser, pointing out that the indictment describes the movement of General Motors cars from the factory to the public, and showing how the evidence supported the Government's contention that the marketing process of General Motors automobiles covers the time they leave the factory until they reach the retail purchaser.

"Undoubtedly the movement of a car from a dealer to a retail purchaser in the same state is intrastate commerce, if considered as an isolated event or as a free transaction in and by itself. The whole picture from the evidence, however, shows a constantly moving flow of General Motors cars, planned and calculated to pass from GMC through GMSC through the dealers to the consumers, in a background where production is projected in advance of retail orders and later adjusted to retail consumption at the production end of the movement. Moreover, as we have already pointed out, the retail and wholesale phases of the commerce in General Motors cars are mutually dependent; restraints placed upon one phase of the commerce necessarily affect the other phase; and without the retail sale there could be no wholesale transaction. The true perspective is to be drawn from the whole picture, and the interstate commerce involved in this case is that from the manufacturer, through the dealers, to the ultimate consumer. Even assuming that the only interstate commerce involved is the movement of cars from the factory to the dealers, a restraint imposed upon the movement of cars from the dealers to the retail public would necessarily affect the shipment and movement of the cars while unquestionably they are in interstate commerce, and consequently we need not really decide when the interstate commerce ends and that which is intrastate commerce begins."

The opinion then states: "It is well settled that the federal government may, under the Sherman Act regulate local commerce which is intimately related to interstate commerce or local activity which obstructs or burdens interstate commerce." (Citing a wealth of authority).

Applying this reasoning to our analogous situation, it would seem the defendants would interfere with the price and flow of such products through the retail dealer to the ultimate consumer. Thus the Sherman Act is violated, even though in a narrow sense the business of the retailer might be intrastate commerce, so far as it operates to force unreasonable terms and conditions upon the independent trader, it necessarily burdens interstate commerce in that particular product, and affects the retailer's ability to do business in the interstate markets.

Furthermore, as stated (United States v. General Motors Corp., supra), "The test of illegality under the Sherman Act is not so much the particular form of business organization effected, as it is the presence or absence of restraint of trade and commerce."

It is not necessary to produce evidence or prove acts or things done pursuant to the conspiracy. Conviction can be sustained even though the conspiracy has never been carried out. This because the offense condemned by the Sherman Act is the act of conspiring. Socony-Vacuum Oil case, supra.

We are of the opinion that the authorities here cited—all to the same effect—and what has been said, indicate that both counts of this indictment are good against the demurrers and motions to quash, and the same are overruled.