Dan FRACKOWIAK, Plaintiff,

v.

FARMERS INSURANCE COMPANY, INC., a Kansas Corporation, et al., Defendants.

Civ. A. No. 75–31–C2.

United States District Court, D. Kansas.

April 13, 1976.

Richard D. Rixner, Rixner & Callen, Overland Park, Kan., for plaintiff.

Richard H. Heilbron, Heilbron & Powell, Kansas City, Mo., Edward M. Boyle, of Payne & Jones, Chartered, Olathe, Kan., for defendants.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This case, a private antitrust action brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, is now before the court for determination of the defendants' various motions for summary judgment, and the defendants' motion to tax costs of the deposition of Robert Busch. Upon review-

ing the memoranda filed by the parties, the affidavits and depositions submitted in support of the defendants' motions, and in light of the positions advanced at oral argument on February 6, 1976, the court makes the following findings and order.

■ In considering a motion for summary judgment, the court is bound by several well-established principles. First, we must look at the record on summary judgment in the light most favorable to the party opposing the motion, *Gragg v. Travelers Insurance Co.,* 459 F.2d 418 (10th Cir. 1972), and it is in this context that the party moving for summary judgment must demonstrate his entitlement to it beyond a reasonable doubt. *James v. Atchison, Topeka and Santa Fe,* 464 F.2d 173 (10th Cir. 1972). Second, the relief contemplated by Rule 56 of the Federal Rules of Civil Procedure is drastic and should be applied with caution, to the end that the litigants will have a trial on a bona fide factual issues. *E. g., Bushman Construction Co. v. Conner,* 307 F.2d 888 (10th Cir. 1962); *Frey v. Frankel,* 361 F.2d 437 (10th Cir. 1966). In the instant case, the latter principle must be applied in accordance with the specific mandate of Rule 56(e) that in resisting a motion for summary judgment supported by matters extrinsic to the pleadings, the plaintiff "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." In other words, a party in the position of the plaintiff here must "show his hand and present facts which would justify a trial." *Transnational Insurance Company v. Rosenlund,* 261 F.Supp. 12 (D.Or.1966).

For purposes of the instant motion, the following facts appear to be uncontroverted: The defendants here are a number of noncompetitive companies offering different lines of insurance policies marketed by a common agency force under common management; they are collectively referred to as the Farmers Insurance Group [FIG]. More specifically, Farmers Insurance Exchange, Truck Insurance Exchange, and Fire Insurance Exchange are reciprocal or inter-insurance exchanges which write various lines of insurance policies. Mid-Century Insurance Company, which writes still other lines of insurance, is a wholly-owned subsidiary of Farmers Insurance Exchange. Farmers New World Life Insurance Company is a public corporation the majority of whose shares are owned by Farmers Group, Inc. Farmers Group, Inc., is a corporation whose stock is wholly owned by the three reciprocal insurance exchanges listed above. It is an insurance holding company which provides all management services for the three exchanges and their subsidiaries. These management services are performed through full-time salaried employees of Farmers Group, Inc., operating from a home office in Los Angeles, California, and (as of 1971) nine regional offices throughout the United States.

From 1962 until 1971, the plaintiff here was located in Mission, Kansas, and performed the duties of district manager for the various entities comprising the Farmers Insurance Group. The plaintiff's services were performed under two consecutive "District Manager Appointment Agreements," the former effective from December 28, 1962, and the superceding agreement effective from September 1, 1967. The 1967 agreement was executed as a result of FIG's adoption of a certain Agency Development Plan which in many ways not pertinent here redefined the functions of district managers. The 1967 agreement, insofar as it is relevant here, provided in paragraph D that the district manager's appointment could be cancelled "without cause by either the District Manager or the Companies on 30 days written notice." The agreement also provided in paragraphs E and F that in the event of cancellation or termination the district manager "agrees that for a period of three years from date of said cancellation or termination he will neither directly nor indirectly in any manner solicit, accept or service, for or on behalf of himself or any insurer or broker, the

insurance business of any policyholder of the Companies within the County or Counties in which the district is located and all Counties immediately adjoining." At some time in early 1971, FIG decided to exercise its contractual option to terminate the plaintiff's district manager appointment and gave the plaintiff notice as required by the contract. Thereafter, on March 15, 1971, the plaintiff and the companies executed an "Agreement of Termination of Appointment Agreement," effective February 28, 1971. This agreement was primarily concerned with fixing the compensation which the plaintiff was to receive upon termination of his appointment and sale of his district, but paragraph 8 of the termination agreement contained a nonsolicitation clause identical to those found in paragraph E and F of the 1967 appointment agreement.

The plaintiff's complaint is a virtual tirade against various "dictatorial" practices of the defendants, including allegations that the defendants "conspired" to deprive the plaintiff of his "successful career;" that the district manager appointment agreement was written in "cunning" language with the intent of destroying the plaintiff's investment in his career; that the defendants employed "autocratic" and "arbitrary" procedures for the sole purpose of asserting unjustified control over the plaintiff; that all of the actions of the defendants were conceived and carried out for the purpose of restraining trade and commerce among the various states and monopolizing the writing and placing of insurance coverage in the United States. These and other actions of the defendants were alleged to violate unspecified provisions of the Sherman and Clayton Acts and therefore to entitle the plaintiff to $3,725,000.00 in actual and treble damages.

In response to the defendants' motions for summary judgment, the plaintiff at the time of oral argument and by subsequent memoranda quite substantially redefined the nature of his claim for damages. The plaintiff now states that his claim is limited to the single theory that after terminating the plaintiff's district manager position without just cause, the defendants boycotted and blacklisted the plaintiff and thereby forced his exclusion from the entire business of insurance. The plaintiff does not contend that this is a case of "overt blacklisting," but argues that said blacklisting was accomplished by the defendants' use of the "broad non-competition clause" contained in both his appointment and termination agreements. He claims that because these clauses were present, other insurance companies—potential employers of the plaintiff—refused to hire or deal with him after his termination with FIG. The plaintiff concludes that the practical effect of the defendants' course of action was "concerted persuasion of third parties to refrain" from business relations with the plaintiff and that as a result of such "concerted persuasion," the defendants are subject to liability under Section 1 of the Sherman Act, 15 U.S.C. § 1.

In support of their motions for summary judgment on this claim, the defendants argue (1) that Section 1 of the Sherman Act can only be violated if there is an agreement, between two or more parties, in restraint of trade or commerce; (2) that the defendants here, because they constitute but one corporate entity, are not legally capable of agreeing or conspiring on any subject; (3) that even if the defendants are viewed as separate and distinct entities, (a) any agreement or conspiracy between them, as non-competitors, could not result in a restraint of trade, and (b) their decision to terminate or refuse to deal with the plaintiff was not so anticompetitive in purpose or effect as to constitute an unreasonable restraint of trade or a boycott illegal under Section 1 of the Sherman Act; (4) that the federal antitrust laws have no application to the formation or termination of contracts of agency such as the one in question here; (5) that there is a fatal lack of evidence that the alleged actions of the defendants had any impact on interstate commerce; (6) that inasmuch as this action involves areas of the "business of insurance" that are reg-

ulated by state law, the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, exempts the subject matter of this action from the application of the federal antitrust laws; and (7) that the evidentiary record here is wholly barren of support for a finding that any boycott or blacklisting occurred.

After reviewing the contentions of the parties in light of the undisputed facts and the relevant law, the court finds that the defendants are entitled to summary judgment for the following reasons:

■ **A. JURISDICTION.** The jurisdictional reach of Section 1 of the Sherman Act is "keyed directly to effects on interstate markets and the interstate flow of goods," and the requirement that the defendants' alleged misconduct have some significant impact upon "trade or commerce among the several States" is therefore an issue of subject-matter jurisdiction as well as a necessary element of a substantive claim under the federal antitrust statutes. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194, 203 n. 19, 95 S.Ct. 392, 402, 42 L.Ed.2d 378, 386 (1974). Purely local activity, not motivated by the purpose of restraining interstate commerce and not achieved by means that directly touch upon interstate commerce, is therefore insulated from the operation of the Sherman Act. *E. g., United States v. Frankfort Distilleries*, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945); *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); *Industrial Association of San Francisco v. United States*, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849 (1925). On the other hand, where the alleged misconduct directly infringes upon the interstate aspects of the plaintiff's business, *e. g., DeVoto v. Pacific Fidelity Life Insurance Co.*, 516 F.2d 1 (9th Cir. 1975); *Hospital Building Company v. Trustees of Rex Hospital*, 511 F.2d 678 (4th Cir. 1975), citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Lieberthal v. North Country Lanes, Inc.*, 332 F.2d 269 (2nd Cir. 1964), or where the restraint occurs wholly in interstate commerce but "substantially affects" interstate commerce, *e. g., Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), the jurisdictional predicate for a private antitrust action is sufficiently shown.

■ After examining the complaint and the evidentiary record, the court finds that the allegations and facts are insufficient to raise a legal inference that the subject matter of this dispute lies within the jurisdiction of this court. The complaint's bare averment that the defendants both intended and accomplished "a combination and conspiracy in restraint of trade and commerce among the several states" is clearly insufficient, standing alone, to withstand a motion for summary judgment on the ground that the requisite impact upon interstate commerce is lacking. With the exception of this one highly conclusory allegation, the complaint contains but one allegation which is pertinent to our inquiry into subject-matter jurisdiction, *i. e.* that the defendants' "termination without cause of plaintiff, by a contract including a noncompetition clause" prevented the free flow of insurance coverage in commerce among the several states. This contention is wholly unsupported, if not directly contradicted, by the undisputed facts of the evidentiary record before us.

In the first place, what the plaintiff chooses to characterize as a "broad noncompetition clause" is in fact—as the express language of the termination agreement demonstrates—a rather narrow nonsolicitation clause prohibiting the plaintiff for a period of three years from soliciting, accepting, or servicing the insurance business of Farmers Insurance Group policyholders in a limited geographical area. The contract did not require the plaintiff to refrain from engaging in all aspects of the insurance business or prohibit him—for any peri-

od of time—from selling competing lines of insurance. Even assuming that in circumstances not present here the enforcement of such a nonsolicitation clause might substantially affect interstate commerce, it is difficult in this case to perceive how the "free flow of insurance coverage in commerce among the several states" stood in any different posture after plaintiff's termination than it did prior to his termination. It is undisputed that under the 1967 Appointment Agreement the plaintiff's primary responsibilities as district manager were the recruitment, training, motivation, and guidance of insurance agents for Farmers Insurance Group. While he received a commission on the premiums produced or insurance policies generated by his agents, the plaintiff himself was not personally involved in selling insurance, settling claims, collecting premiums, or other direct contacts with current or prospective purchasers of insurance. The record simply cannot support an inference that the plaintiff's termination as district manager had any effect whatsoever upon the quantity, quality, price, or "free flow" of insurance policies available for purchase or purchased in the interstate market. The record here contains no evidence that after the plaintiff's termination, (1) the plaintiff was unable to secure an insurance company's sponsorship for a state insurance agent's license; (2) any particular insurance agency or brokerage refused to hire or deal with the plaintiff; (3) the plaintiff was prevented from self-employment in the insurance business; or (4) any insurance company refused to sell or accept policy coverage placed with it by the plaintiff. Further, even if the facts were otherwise, we would be hard pressed to find that the alleged restraint of interstate commerce was illegally caused by any activities of the *defendants*. At the time of termination the plaintiff agreed to the very clause which he now attacks and, on deposition, he testified that he "did not want to violate the contract" and made no effort to re-enter the insurance business until 1974, when the three-year nonsolicitation provision had expired.

In conclusion, the court finds that as a matter of law on the basis of the undisputed facts set forth above, the defendants' actions here had no appreciable effect on any interstate trade or commerce of the plaintiff and did not otherwise "substantially affect" the free flow of interstate commerce. In response to the defendants' motions for summary judgment, the plaintiff has neither alleged nor adduced significant evidence probative of his contention that the interstate commerce requirements of Section 1 of the Sherman Act are satisfied. Nor has he directed our attention to any genuine issue of material fact in this regard. We therefore hold that this court lacks jurisdiction over the subject matter of the instant complaint; that due to the lack of evidence of impact upon interstate commerce, the plaintiff's alleged injuries are not remediable under the substantive provisions of Section 1 of the Sherman Act; and finally, that the defendants are entitled to summary judgment in this regard.

B. *"CONTRACT, COMBINATION OR CONSPIRACY."* The plaintiff here, proceeding on the theory that he was the victim of a group boycott, contends that the individual defendants conspired to terminate his district managership under terms intended to bar him from engaging in the business of insurance. The plaintiff does not contend that absent a conspiracy the contract in question would violate the federal antitrust statutes; his election to proceed solely on the theory of concerted action or conspiracy is apparently premised upon his interpretation of the rule of law that a group boycott—if proven—is conclusively presumed to be unreasonable in its restraint of interstate commerce and thus *per se* violative of Section 1 of the Sherman Act. *E. g., Klor's v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Thus, by relying on the group boycott or conspiracy theory, the plaintiff apparently seeks to avoid the necessity of proving the unreasonableness of the contract in question.

For purposes of this motion we shall assume, without deciding, that in spite of the close intracorporate relationships between the defendants, they are independent entities capable of legally "conspiring" with each other under Section 1 of the Sherman Act. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co., supra.* The court is far from convinced, however, that the plaintiff has produced evidence sufficiently probative of the existence of a conspiracy to entitle him to resist a motion for summary judgment.

First, the plaintiff's contention that conspiracy is proven by the bare fact of joint execution of a contract is wholly without any legal support of which this court is aware. The Supreme Court has observed that if Section 1 of the Sherman Act were to be read in the narrowest possible way, any commercial contract could be deemed to violate it. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515, 524 (1972); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918). It is well-established, however, that the federal antitrust statutes were not intended and have not been construed to interfere with ordinary commercial practices in interstate commerce which are bona fide and not in restraint of trade. *E. g. Naifeh v. Ronson Art Metal Works, Inc.,* 218 F.2d 202 (10th Cir. 1954). Here, the plaintiff's district managership was a joint appointment executed by the individual defendants. It seems to logically follow that consensus and joint action of these same defendants would be necessary to terminate that appointment. The court is wholly unpersuaded, however, that the joint execution of a garden-variety agency contract or the joint execution of a contract terminating that agency evidences a "conspiracy" within the contemplation of the Sherman Act. As the Supreme Court stated in *United States v. Kissel,* 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), "[a] con-spiracy in restraint of trade is different from and more than a contract in restraint of trade."

Second, a "conspiracy" in violation of the Sherman Act is not established by mere proof of joint undertaking or concerted action. It requires a combination to accomplish an unlawful purpose or to accomplish some purpose, not unlawful in itself, by unlawful means. *E. g., United States v. Kissel, supra; Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506 (6th Cir. 1972); *Standard Oil Company of California v. Moore,* 251 F.2d 188 (9th Cir. 1957); *Lynch v. Magnavox Co.,* 94 F.2d 883 (9th Cir. 1938); *United States v. National Retail Lumber Dealers Ass'n,* 40 F.Supp. 448 (D.Colo.1941). The record here contains not a scintilla of evidence that the defendants' conspiracy, if it in fact existed, was motivated by the purpose of driving the plaintiff out of the insurance business. The termination agreement itself suggests a much more limited and—as we will discuss below—not unlawful purpose for the defendants' actions. The evidentiary record contains no hint that the defendants individually or in concert took any actions intended to persuade potential customers of the plaintiff to channel their insurance business elsewhere, to encourage other insurance companies to refuse to deal with or through the plaintiff, or to sabotage the plaintiff's efforts—if he in fact made any efforts—to engage in the insurance business.

The plaintiff here, in short, has not produced such "significant probative evidence" of the existence or of the unlawful purposes of the "conspiracy" upon which his claim is based, and he therefore is not entitled to resist summary judgment on the mere basis of the allegations of his complaint. *First National Bank of Arizona v. Cities Service Co., supra,* 391 U.S. at 289, 88 S.Ct. at 1592, 20 L.Ed.2d at 592. The plaintiff does not contend that there are facts relevant to the conspiracy issue which are not before the court; he merely argues that the established facts are susceptible of an inference

of conspiracy actionable under the federal antitrust statutes. We disagree. While motive is usually a question reserved for the trier of fact at the time of trial, the court finds that reasonable minds could not differ from the conclusion that the evidentiary record now before the court would not sustain a finding that the defendants engaged in an unlawful conspiracy. *E. g., Lopez v. Denver & Rio Grande Western Railroad Co.,* 277 F.2d 830 (10th.Cir. 1960); *Transcontinental Bus System, Inc. v. Taylor,* 265 F.2d 913 (10th Cir. 1959); *Commercial Standard Insurance Co. v. Feaster,* 259 F.2d 210 (10th Cir. 1958).

■ C. *"REASONABLENESS."* A basic tenet of antitrust law is that the Sherman Act was not intended to prohibit "all contracts that might in some insignificant degree or attenuated sense restrain trade or competition." *United States v. Topco Associates, supra,* 405 U.S. at 606, 92 S.Ct. at 1133, 31 L.Ed.2d at 525. Thus, in most cases, the Supreme Court has adopted a "rule of reason" analysis for determining whether—in light of facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, the history of the restraint and the reasons for its adoption—the alleged combination, conspiracy, or contract violates the prohibitions of the Sherman Act. *E. g., United States v. Topco Associates, supra; Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Addyston Pipe & Steel Co.,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Certain types of business relationships, however, because of their "pernicious effect on competition and lack of any redeeming virtue," *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958), are conclusively presumed to be unreasonable and thus constitute *per se* violations of the Act. Within this latter category the Supreme Court has included group boycotts, or concerted refusals by traders to deal with other traders.

*E. g., Klor's v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

Although the plaintiff here refers in sweeping and bellicose terms to the defendants' alleged conspiracy to drive him out of the insurance business, our inquiry here is appropriately confined to the evidence in support of the reasonableness or unreasonableness—*per se* or otherwise—of the three particular strategems by which the defendants allegedly achieved their unlawful objective: (1) termination of the plaintiff's district managership; (2) requiring inclusion of a nonsolicitation clause in the termination agreement; and (3) blacklisting the plaintiff.

■ The alleged unlawfulness of the plaintiff's termination rests solely upon his argument that it was effectuated by means of a group boycott by the individual defendants, for the plaintiff does not contend that the termination was in itself unlawful or contrary to the terms of the 1967 appointment agreement. The court is not bound, of course, by the plaintiff's depiction of the situation as one constituting a "group boycott." The plaintiff has not referred us to a single case which supports the apparently unprecedented proposition that entities which jointly execute an agency contract may not terminate that contract without being held strictly liable for treble damages under a "group boycott" theory based on the federal antitrust statutes. It is quite well established that a single seller, manufacturer, or trader has the right to "deal with whom it pleases" in matters of employment, agency, distributorships and other commercial relationships. *E. g., United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18. L.Ed.2d .1249 (1967); *United States v. Colgate & Co.,* 250 U.S.

300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Shawver & Son, Inc. v. Oklahoma Gas & Electric Co.,* 463 F.2d 204 (10th Cir. 1972); *Naifeh v. Ronson Art Metal Works,* 218 F.2d 202 (10th Cir. 1954); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963); *Bushie v. Stenocord Corp.,* 460 F.2d 116 (9th Cir. 1972); *House of Materials v. Simplicity Pattern, Inc.,* 298 F.2d 867 (2nd Cir. 1962). Such a manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are "sufficient to the manufacturer alone," and any adverse effect such decision may have upon the person with whom he refuses to deal is immaterial in the absence of an arrangement restraining trade or commerce. *Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc.,* 375 F.Supp. 1206 (S.D.N.Y.1974), and cases cited therein. Group boycotts, however, because of their inherent tendency to monopolize and their intrinsically coercive potential, have been excepted from this general rule applicable to single traders in the private sector.

■ On the basis of the record before the court, it simply cannot be inferred that the defendants' actions in terminating the plaintiff bore any traditional earmarks of a prohibited "group boycott." Nor is there a hint of evidence that the plaintiff's termination, in itself, was motivated to any degree whatsoever by an intent to restrain trade, create a monopoly, or any other anticompetitive purpose prohibited by the antitrust statutes. Even if we were to assume that the plaintiff performed his district managership duties very well, that the defendants' refusal to continue their relationship with the plaintiff caused injury to the plaintiff, and that the termination was unlawful under state law, neither the existence of a group boycott nor the presence of a purpose to restrain trade could be inferred from those facts. *E. g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969); *GAF Corporation v. Circle Floor Co.,* 329 F.Supp. 823 (S.D.N.Y.1971); *Bay City-Abrahams Bros., supra.*

The plaintiff apparently believes that he is entitled to resist summary judgment on the group boycott claim solely on the strength of his allegations and the fact that there is more than one defendant. The court disagrees and finds that because the plaintiff has failed to demonstrate the existence of *any* probative evidence which significantly tends to prove that his termination resulted from a group boycott of the kind envisioned by the Sherman Act, this question is not a "genuine issue" on which the plaintiff is entitled to proceed to trial.

■ The court likewise concludes that no genuine issue of fact or law is raised by the plaintiff's allegation that the noncompetition clause in question here is either *per se* illegal or otherwise unreasonable within the meaning of the Sherman Act. Even assuming, contrary to the express language of the termination agreement, that the non-solicitation clause may be characterized as a "broad noncompetition clause," the challenged provisions would not necessarily be vulnerable to attack under the Sherman Act. Numerous courts have recognized the general rule that agreements not to compete, entered into in conjunction with the termination of employment or the sale of a business, do not offend the federal antitrust provisions if they are reasonable in duration and geographical limitation. *E. g., Day Companies v. Patat,* 403 F.2d 792 (5th Cir. 1968); *Alders v. AFA Corp. of Florida,* 353 F.Supp. 654 (S.D.Fla.1973); *Bradford v. New York Times Co.,* 501 F.2d 51 (2nd Cir. 1974). The Second Circuit Court of Appeals in *Bradford,* noted that "[n]ot only has [plaintiff] failed to supply us with any case holding an employee [covenant not to compete] to be a *per se* violation, but no court applying the rule of reason has ever held such a contract violative of section 1 of the Sherman Act." 501 F.2d at 59.

■ The challenged covenant in this case was executed in conjunction with the plaintiff's termination and the sale back to the defendants, pursuant to a contractual purchase option, of the plaintiff's district. The covenant not to solicit was limited to

three years and encompassed only those counties in which the plaintiff's former district was located and counties adjacent thereto. The plaintiff, apparently choosing to rest upon the theory that the nonsolicitation agreement is *per se* unreasonable, has not favored the court with any allegations or facts tending to demonstrate the fact of unreasonableness. There appears to be a total lack of Sherman Act experience with nonsolicitation clauses such as these in the insurance business and elsewhere, and the court is in no position to declare the instant agreement a *per se* violation of 15 U.S.C. § 1. *United States v. Topco Associates, Inc., supra,* 405 U.S. at 607–608, 92 S.Ct. at 1133, 31 L.Ed.2d at 525. Further, there is absolutely no evidence in the record now before the court which would support an inference that in light of the circumstances existing in the insurance business in general, or in the particular circumstances of this case, the nonsolicitation agreement in question there is unreasonable as to scope, duration, or any other factor.

■ With reference to his claim of "blacklisting," the plaintiff apparently concedes the total lack of direct evidence in support thereof. He instead argues that said blacklisting must be "inferred from the facts." However, the sole fact to which the plaintiff points in support of this inference is the fact that insurance companies not allied with Farmers Insurance Group "refused to deal with plaintiff by acquiescence to the terms dictated by the noncompetition clause in the termination agreement." Even if we agreed with the preposterous contention that such "acquiescence" (by persons not specifically identified and not parties to this action) is sufficient to support an inference that the defendants here should be held liable for treble damages on the theory of blacklisting, the allegation that third parties refused to deal with plaintiff because of the nonsolicitation clause appears to be utterly refuted by the plaintiff's own testimony at deposition. First, the plaintiff testified that he did not approach any insurance agencies or broker-

ages about employment until after the three-year term of the nonsolicitation clause had expired. Second, the plaintiff did secure an employment agreement with an insurance brokerage shortly after the three-year period had expired. Although that employment relationship was never consummated due to a change in the financial situation of that brokerage, the plaintiff apparently found his former relationship with Farmers to have posed no barrier in that regard. Third, to the extent the plaintiff sought employment with other agencies after the three years had lapsed, he testified that his prospects were hindered because of his age, the fact that he had previously been highly paid, and the fact that he had been involuntarily terminated. No mention of any alleged "blacklisting" was made at the time of deposition, and it indeed strikes the court that the entire blacklisting theory is an afterthought and a last-ditch effort to conjure up some allegation that might be sufficient to withstand the defendants' motions for summary judgment.

Under these facts the court must conclude that the plaintiff has failed to submit probative evidence of blacklisting sufficient to raise a genuine issue deserving of trial. The cases on which the plaintiff relies, *Meicler v. Aetna Casualty and Surety Co.,* 506 F.2d 732 (5th Cir. 1975); *Addrisi v. Equitable Life Assurance Society of the United States,* 503 F.2d 725 (9th Cir. 1974); and *Transnational Insurance Co. v. Rosenlund,* 261 F.Supp. 12 (D.Or.1966), do not compel a contrary conclusion.

*D. CONCLUSION.* After spending some time reviewing the pleadings and evidentiary record in this case in light of the relevant law, the court concludes that this case represents an instance in which "injury resulting from normal business hazards is sought to be redressable by casting the affair in antitrust terms" that simply do not fit the case. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 474, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 465 (1962) (Harlan, J., dissenting). As recently as

1968, the United States Supreme Court rejected the suggestion that "Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 592 (1968). In that case, the Court held, "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Id.*

The court finds, for all of the reasons stated above, that no genuine issues of material fact remain to be determined in this matter; that whatever injuries the plaintiff may have suffered are not legally amenable to redress under the federal antitrust statutes; and that as a matter of law the defendants are entitled to summary judgment. Most certainly, if this case had reached the trial stage on the record now before the court, and a motion for directed verdict were presented, the court would be compelled to sustain it on the defendants' behalf.

With reference to the defendants' motion to tax against the plaintiff the costs of deposing Robert Busch, the court finds that said motion should be overruled.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment be sustained and that the action be dismissed at plaintiff's costs. Counsel for defendants shall prepare, circulate, and present to the court an appropriate journal entry reflecting the foregoing memorandum and order.